# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# EASTERN DIVISION

| | |
|---|---|
| KENDALL HUNT PUBLISHING COMPANY,<br><br>Plaintiff,<br><br>vs.<br><br>THE LEARNING TREE PUBLISHING CORPORATION,<br><br>Defendant. | No. 21-CV-1004-KEM<br><br>**MEMORANDUM OPINION AND ORDER** |

_____

Currently pending before the court is Defendant The Learning Tree Publishing Corporation's motion to dismiss for lack of personal jurisdiction and for failure to state a claim (Doc. 20). I **grant** the motion (Doc. 20).

## I.   BACKGROUND

Plaintiff Kendall Hunt Publishing Company initiated this lawsuit in February 2021, alleging copyright infringement, tortious interference with contract, unfair competition, and violations of the Racketeer Influenced and Corrupt Organizations Act (RICO). Docs. 1, 15. Kendall Hunt alleges that an ethics textbook published online by Defendant Learning Tree copies large portions of one of Kendall Hunt's textbooks. *Id*. Kendall Hunt alleges that it contracted with the author, Nicholas Baiamonte, to write the textbook, and the author assigned the copyright and exclusive publishing rights in the book to Kendall Hunt. *Id*. The allegedly infringing Learning Tree textbook was also written by Baiamonte. *Id*. Kendall Hunt alleges that Learning Tree lured Baiamonte away from Kendall Hunt and convinced him to have his textbooks published by Learning Tree instead, interfering with Kendall Hunt's contracts with Baiamonte. *Id*.

The two founding (and sole) owners of Learning Tree, Frank Forcier and John Coniglio, previously worked as editors for Kendall Hunt, leaving in October 2019 to start Learning Tree. *Id.* Kendall Hunt is based in Iowa, but Forcier and Coniglio worked for Kendall Hunt from California, where they still reside to this day. *See* Docs. 37-1, 37-2.

From November 2014 to October 2019, Forcier was the Kendall Hunt editor of the Baiamonte ethics textbook, and Baiamonte's primary contact at Kendall Hunt. Doc. 33-2. Kendall Hunt submitted a declaration that the contracting, editorial, development, and sales process for the Baiamonte textbook, "in which . . . Forcier was involved as . . . Baiamonte's editor, occurred in" Iowa. *Id.* The declaration further states that Kendall Hunt's contracts with Baiamonte were "negotiated and entered into in the State of Iowa" and that Forcier "was involved in the negotiation and execution of all written agreements between Kendall Hunt and . . . Baiamonte." *Id.* The declaration notes Forcier "regularly contacted Kendall Hunt's administrative team" in Iowa throughout his employment, "including, but not limited to, contacts related to the contracting, editorial, and sales processes" for the Baiamonte ethics textbook. Kendall Hunt attached three emails as examples of these contacts:

- A May 2017 email from Forcier to Coniglio and Amy Wagner, Forcier's assistant who worked in Iowa, with the subject line "Please approve," and which forwarded an email from a Kendall Hunt employee in Iowa stating that a Baiamonte textbook had been uploaded to the Kendall Hunt website;
- A March 13, 2018 email from Forcier to Wagner in Iowa, forwarding an email from Baiamonte in which he requested payment for necessary revisions to several of his textbooks; Forcier directed Wagner to "have $500 grants on each of them";
- A March 16, 2018 email from Forcier to Baiamonte and cc'ing Wagner, attaching new contracts for $500 per revision for Baiamonte to sign and noting

2

> Baiamonte could "thank [Wagner]," since Forcier would not have been able to "get this done until next month."

Docs. 33-2 at 11-16.

Forcier and Coniglio submitted declarations stating that they "never dealt with . . . Baiamonte in the State of Iowa." Docs. 37-1, 37-2. Baiamonte teaches only at California colleges, and Forcier's and Coniglio's declarations indicated that "any dealings [they] have had with . . . Baiamonte were in the State of California or outside of Iowa." Docs. 20-2, 37-1, 37-2. Forcier further declared that "[w]hile employed at [Kendall Hunt], [he] did not sign any contracts in Iowa." Doc. 37-1. These declarations, in combination with the emails submitted by Kendall Hunt, show that to the extent Kendall Hunt declared the Baiamonte contracts were negotiated and entered into in Iowa, the declarant meant that personnel in Iowa were involved in drafting the contracts, which were entered into over email between Kendall Hunt (an Iowa company) and other parties who were not necessarily in Iowa (like Baiamonte and Forcier).

In a supplemental declaration, Kendall Hunt noted additional contacts between Forcier, Coniglio, and Iowa through their prior employment with Kendall Hunt. Doc. 42. The Baiamonte works were stored on Kendall Hunt's servers in Iowa (which Forcier necessarily accessed as he worked remotely from California). *Id.* Forcier and Coniglio's paychecks were issued from a bank in Iowa. *Id.* Between January 1, 2017, and October 31, 2019, Forcier sent at least 9,300 emails to Kendall Hunt employees in Iowa, and Coniglio sent at least 2,281 emails to Kendall Hunt employees in Iowa. *Id.* During this same two-year period, between the pair, they initiated at least 805 phone calls to personnel in Iowa. *Id.* Finally, Coniglio and Forcier traveled to Iowa for meetings (although Forcier had not visited Iowa for work since 2006): Coniglio attended a two-week sales training in 1995; annual one-week sales meetings from 1995 to 2006; and multiple managers meetings from 1999 to 2006; and he more recently visited for two days from May 8-9, 2018. *Id.* Forcier traveled to Iowa for a two-week sales training in 2005 and a one-week sales meeting in 2006. *Id.*

3

Forcier and Coniglio incorporated Learning Tree in October 2019 in California. Doc. 20-2. Learning Tree sells post-secondary textbooks to students that are accessed virtually through Learning Tree's website. *Id.* Learning Tree first began selling post-secondary textbooks in January 2020. *Id.* It has used two software systems to sell and deliver textbooks online, one in use from January to July 2020 and one from July 2020 to the present. *Id.* Learning Tree markets itself to professors to choose a Learning Tree coursebook for their class; the students then buy the professor's chosen textbook from the Learning Tree website, or they buy a code from the campus bookstore to access the textbook from the Learning Tree website. *Id*

The day before filing this lawsuit, on February 25, 2021, a vice president at Kendall Hunt purchased the allegedly infringing ethics textbook from Learning Tree's website. Doc. 33-2. The website asked him to input his "assigned student" email," first and last name, student identification (ID) number, and phone number; he filled in the form with his Kendall Hunt information and a phony student ID number (1234567890). *Id.* at 9-10. He paid for the textbook via credit card and could then access the textbook from his office in Iowa through the Learning Tree website. Doc. 33-2 at 5.

Kendall Hunt alleges that "[t]hrough its website and its sale of immediate digital access to book and course materials to users, Learning Tree has . . . been doing business in the Northern District of Iowa." Doc. 15 at 2. To prove this allegation, Kendall Hunt served requests for production and interrogatories on Learning Tree. *See* Doc. 30-3. Learning Tree's discovery responses indicate that under the old system in place from January to July 2020, no purchasers of any Learning Tree textbook listed an Iowa address; and under the new system in place from July 2020 to the present, there were no purchases from an Iowa IP address, except for Kendall Hunt's February 25, 2021 purchase (purchasers were not asked to list their address on the new system). *Id.* Learning Tree's discovery responses further note that it has no contracts with people or entities in Iowa, other than with local counsel in this litigation; that it has not sent marketing materials or advertisements to schools, authors, or customers in Iowa; and that

4

it has not emailed with present or past Kendall Hunt authors or employees based in Iowa. *Id.* Although Learning Tree refused to provide information or documents related to sales outside of Iowa, a declaration it filed in support of the motion to dismiss states that it sold fifty textbooks through colleges in Colorado and Oklahoma under the old system in place from January to July 2020; and that since switching to the new system in July 2020, Learning Tree's sales have been only through educational institutions in California. Doc. 20-2. The declaration further states that Learning Tree has no other employees besides Forcier and Coniglio. *Id.*

Kendall Hunt submitted a declaration that a previous iteration of Learning Tree's website (in 2020) represented that Learning Tree employed sales representatives around the United States and the world. Doc. 33-2. The declaration also states Learning Tree's website advertised offices in San Francisco, New York, London, and Brisbane. *Id.*

Learning Tree moved to dismiss for lack of personal jurisdiction. Doc. 20. Learning Tree argues that it does not have sufficient contacts with the state of Iowa to be subject to jurisdiction here. Learning Tree also moved to dismiss for failure to state a claim. Kendall Hunt resists. Doc. 33. Learning Tree filed a reply (Doc. 37), Kendall Hunt filed a supplemental resistance (Doc. 43), and Learning Tree filed a supplemental reply (Doc. 48). The parties consented to the exercise of jurisdiction by a United States magistrate judge, and the case was referred to me for final disposition. Doc. 22.

## II. PERSONAL JURISDICTION

"Personal jurisdiction can be specific or general."[1] General jurisdiction exists over out-of-state corporations "to hear any and all claims against them when their affiliations with the [forum] State are so 'continuous and systematic' as to render them

---

[1] *Fastpath, Inc. v. Arbela Techs. Corp.*, 760 F.3d 816, 820 (8th Cir. 2014) (quoting *Viasystems, Inc. v. EBM-Papst St. Georgen GmbH & Co.*, 646 F.3d 589, 593 (8th Cir. 2011)).

5

essentially at home."[2] "In contrast to general, all-purpose jurisdiction," specific jurisdiction "depends on an 'affiliation between the forum and the underlying controversy.'"[3] Here, the parties agree general jurisdiction does not exist over Learning Tree; only specific jurisdiction is at issue.

"A district court may exercise specific jurisdiction over an out-of-state defendant only to the extent permitted by the state's long-arm statute and the Constitution's due process clause."[4] "Because Iowa's long-arm statute expands Iowa's jurisdictional reach to the widest due process parameters allowed by the United States Constitution," I must determine only "whether the exercise of personal jurisdiction comports with due process."[5]

Due process "forbids the exercise of personal jurisdiction 'under circumstances that would offend traditional notions of fair play and substantial justice.'"[6]

> "[A] defendant [must] have certain 'minimum contacts' with the forum State for the State to exercise specific jurisdiction." The defendant's connection with the forum state must "be more than random, fortuitous, or attenuated, and must permit the defendant to reasonably anticipate being haled into court there." The contacts therefore have to be based on "some act by which the defendant purposely avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws."[7]

---

[2] ***Goodyear Dunlop Tires Operations, S.A. v. Brown***, 564 U.S. 915, 919 (2011) (quoting ***International Shoe Co. v. Washington***, 326 U.S. 310, 317 (1945)).

[3] *Id.* (cleaned up) (quoting **Arthur von Mehren & Donald Trautman**, **Jurisdiction to Adjudicate: A Suggested Analysis**, 79 Harv. L. Rev. 1121, 1136 (1966)).

[4] ***Morningside Church, Inc. v. Rutledge***, 9 F.4th 615, 619 (8th Cir. 2021) (quoting ***Federated Mut. Ins. Co. v. FedNat Holding Co.***, 928 F.3d 718, 720 (8th Cir. 2019)).

[5] ***Fastpath***, 760 F.3d at 820 (quoting ***Wells Dairy, Inc. v. Food Movers Int'l, Inc.***, 607 F.3d 515, 518 (8th Cir. 2010)); *see also* ***Shams v. Hassan***, 829 N.W.2d 848, 854 n.1 (Iowa 2013).

[6] ***Creative Calling Sols. Inc. v. LF Beauty Ltd.***, 799 F.3d 975, 981-82 (8th Cir. 2015) (quoting ***Asahi Metal Indus. Co. v. Superior Ct.***, 480 U.S. 102, 113 (1987)).

[7] ***Morningside Church***, 9 F.4th at 619 (citations omitted) (quoting ***Creative Calling***, 799 F.3d at 980; ***Federated Mut.***, 928 F.3d at 720).

Of primary importance are "the nature, quality, and quantity of the defendant's contacts with the forum State and the connection between the cause of action and those contacts."[8] The court also considers "the interest of the forum state in providing a forum for its residents" and "the convenience or inconvenience to the parties," but these factors carry less weight and "cannot themselves create personal jurisdiction" in the absence of "sufficient minimum contacts" with the forum state.[9] The plaintiff bears the burden of proving personal jurisdiction and "must make a prima facie showing of personal jurisdiction" to survive a motion to dismiss.[10]

### A. Defendant's Single Internet Sale to Plaintiff

Kendall Hunt argues that because Learning Tree made its textbooks available for purchase to consumers in Iowa via its website, personal jurisdiction exists. But a "website's accessibility in [the forum state] alone is insufficient to confer personal jurisdiction."[11] Instead, the court considers a defendant's website contacts with the forum using the *Zippo* sliding scale:

> At one end of the spectrum are situations where a defendant clearly does business over the Internet. If the defendant enters into contracts with residents of a foreign jurisdiction that involve the knowing and repeated transmission of computer files over the Internet, personal jurisdiction is proper. At the opposite end are situations where a defendant has simply posted information on an Internet [website] which is accessible to users in foreign jurisdictions. A passive [website] that does little more than make information available to those who are interested in it is not grounds for the exercise of personal jurisdiction. The middle ground is occupied by interactive [websites] where a user can exchange information with the host computer. In these cases, the exercise of jurisdiction is determined by

---

[8] *Creative Calling*, 799 F.3d at 980.

[9] *Pederson v. Frost*, 951 F.3d 977, 980, 981 n.4 (8th Cir. 2020) (quoting *Johnson v. Arden*, 614 F.3d 785, 794 (8th Cir. 2010)).

[10] *Fastpath*, 760 F.3d at 820.

[11] *Johnson*, 614 F.3d at 796.

7

examining the level of interactivity and commercial nature of the exchange of information that occurs on the [website].[12]

Here, Learning Tree conducts business over its website, as students can purchase and download textbooks from it. But Learning Tree does not regularly conduct business over its website with people in the forum—Learning Tree has only one sale to a person in Iowa (via its website or otherwise). In addition, this single sale to a person in Iowa was not a purchase by a student, but rather, a purchase made by Kendall Hunt the day before it filed this lawsuit. Learning Tree argues that even if a single website sale to a customer in the forum state would be sufficient to confer personal jurisdiction, Kendall Hunt cannot manufacture personal jurisdiction by making a purchase over Learning Tree's website. Learning Tree acknowledges a split among district courts on the issue but argues that the majority of "courts have found a single online sale into the forum is insufficient to confer specific jurisdiction when the sale was orchestrated by the plaintiff."[13]

---

[12] ***Lakin v. Prudential Sec., Inc.***, 348 F.3d 704, 710-11 (8th Cir. 2003) (cleaned up) (quoting ***Zippo Mfg. Co. v. Zippo Dot Com, Inc.***, 952 F. Supp. 1119, 1124 (W.D. Pa. 1997)).

[13] ***Regenexx, LLC v. Regenex Health LLC***, 446 F. Supp. 3d 469, 475, 481 (S.D. Iowa 2020) (holding that personal jurisdiction did not exist over defendant who sold infringing product via website when defendant had only two website sales, one of which was to the forum but orchestrated by plaintiff); *see also* ***Bros. & Sisters in Christ, LLC v. Zazzle, Inc.***, No. 4:20-CV-280-NAB, 2021 WL 1380268, at *8-9 (E.D. Mo. Apr. 12, 2021) (holding that personal jurisdiction did not exist over defendant based on single website sale of infringing product into forum when the purchase was made by plaintiff's counsel; defendant had also sold other products to the forum via its website), *appeal filed*, No. 21-1917 (8th Cir. Apr. 26, 2021) (the Eighth Circuit heard argument on the existence of personal jurisdiction on February 16, 2022); *but see* ***Furminator, Inc. v. Wahba***, No. 4:10CV01941 AGF, 2011 WL 3847390, at *1, *5-6 (E.D. Mo. Aug. 29, 2011) (holding that plaintiff "met its burden of making a prima facie showing" that specific jurisdiction existed in trademark-infringement case when defendant sold infringing product on eBay, "and there is evidence of at least one sale [by d]efendant to a purchaser in [the forum], namely, [p]laintiff"; defendant did not submit declarations, as here, denying other sales into the forum); ***Mattel, Inc. v. Adventure Apparel***, No. 00 CIV. 4085(RWS), 2001 WL 286728, at *3-4 (S.D.N.Y. March 22, 2001) (holding that specific jurisdiction existed in case involving trademark-infringement and cybersquatting claims when defendant had made only one sale via its website, a purchase by plaintiff in the forum).

Rather than adopting a bright-line rule, the circuit courts have considered a website purchase by the plaintiff along with the totality of the circumstances[14] in determining purposeful availment.[15] Here, Learning Tree has no employees or offices in Iowa. Its business model involves marketing itself to professors and colleges (who assign Learning Tree textbooks to their students). Learning Tree has not marketed itself to institutions in Iowa, nor has an Iowa institution assigned a Learning Tree textbook for its students (indeed, since July 2020, Learning Tree's textbooks have been assigned only through institutions in California). Learning Tree has no sales in Iowa, other than Kendall Hunt's

---

[14] The court "consider[s] 'the totality of the circumstances in deciding whether personal jurisdiction exists.'" *Myers v. Casino Queen, Inc.*, 689 F.3d 904, 913 (8th Cir. 2012) (quoting *K-V Pharm. Co. v. J. Uriach & CIA, S.A.*, 648 F.3d 588, 592-93 (8th Cir. 2011)).

[15] *See Matlin v. Spin Master Corp.*, 921 F.3d 701, 706-07 (7th Cir. 2019) (holding that in action seeking patent royalties under theories of breach of contract, fraud, and unjust enrichment, personal jurisdiction did not exist over defendant whose only contact with the forum was a single purchase of the patented product via defendant's website by plaintiff after defendant filed the motion to dismiss; the court emphasized that plaintiff's claims sought royalties for purchases nationwide, not just based on plaintiff's single purchase, and distinguished a prior case in which the plaintiff *was* the forum state and brought suit against a cigarette manufacturer for selling unlicensed cigarettes via its website to a state investigator over a period of years); *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 & n.2, 165-67 & n.3 (2d Cir. 2010) (in action alleging defendant sold counterfeit luxury bags via its website, holding that specific jurisdiction existed based on one website sale of infringing bag in forum, purchased by plaintiff, in conjunction with defendant's sales of fifty-two handbags from other brands into the forum, when the record was unclear whether these bags were also counterfeit); *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 395, 398, 401 (4th Cir. 2003) (in action alleging Chicago-based nonprofit advocacy organization's website infringed plaintiff's trademark, holding that defendant was not subject to specific jurisdiction in Maryland based on Maryland plaintiff's donation to defendant via its website; defendant's website repeatedly emphasized its mission to assist Chicago-area women, all defendant's employees and offices were in the Chicago area, no other website donations were from Maryland, and the few other mailed donations from Maryland were mostly before defendant adopted the allegedly infringing name); *Toys "R" Us, Inc. v. Step Two, S.A.*, 318 F.3d 446, 450, 454-55 (3d Cir. 2003) (in trademark-infringement and cybersquatting case, holding that defendant did not "purposefully avail[] itself of any effort to conduct activity in" the forum state based on forum plaintiff twice purchasing product from defendant's website, which was then sent to plaintiff's Spain office and forwarded to plaintiff in forum, as defendant did not ship outside of Spain; and defendant's website used a foreign language and listed prices in a foreign currency).

9

single purchase of the allegedly infringing textbook. To complete the purchase, Kendall Hunt had to input a phony student ID number (the website also asked for an assigned student email, but the purchase went through with the listed Kendall Hunt email address and did not require a .edu email address). After the purchase, Kendall Hunt accessed the textbook online from Iowa, but Learning Tree did not physically mail any product into the forum.

Defendant's business model demonstrates that the purchase (by plaintiff) was "the kind of 'fortuitous,' 'random,' and 'attenuated' contact[] that the Supreme Court has held insufficient to warrant the exercise of jurisdiction."[16] Since Defendant marketed its textbooks to universities, none of which are in or near Iowa, plaintiff's purchase does not show that Learning Tree purposefully availed itself of the privilege of conducting business in Iowa, nor that Learning Tree should have reasonably anticipated being haled into court in Iowa. In addition, whether the purchase by Plaintiff could be part of the basis for Plaintiff's trademark-infringement and other claims, Plaintiff's claims are based on Learning Tree's sales nationwide, the majority of which occurred in California.[17] Thus, the single sale is not strongly related to the claims at issue. Under the circumstances of this case, the single forum purchase by Plaintiff via Defendant's website is insufficient to establish specific jurisdiction.

### B. Defendant's Founders' Prior Employment with Plaintiff

A closer issue is whether Forcier and Coniglio's prior employment with Kendall Hunt constitutes minimum contacts with Iowa. As an initial matter, Kendall Hunt argues that by nature of their prior employment, Forcier and Coniglio knew Learning Tree's tortious conduct would damage Kendall Hunt in Iowa. But as the Eighth Circuit has recognized, the Supreme Court clarified in 2014 what has been called the *Calder* "effects

---

[16] *Toys "R" Us*, 318 F.3d at 454-55.

[17] *See Matlin*, 921 F.3d at 707.

10

test" for intentional torts, making "clear that mere injury to a forum resident is not a sufficient connection to the forum."[18]

> In *Calder*, the Supreme Court "held that personal jurisdiction can exist over a nonresident defendant who commits an intentional tort when its effect is felt primarily within the forum state." But more recently, in *Walden*, the Court made clear that the effects test is subject to two "interrelated limitations." First, the defendant's relationship with the forum state "must arise out of contacts that the defendant himself created with the forum state. Second, we look to the defendant's contacts with the forum state *itself*, not the defendant's contacts with persons who reside there." As the Court explained, the "proper question" for personal jurisdiction "is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way." "[T]he plaintiff cannot be the only link between the defendant and the forum."[19]

The "foreseeability of causing injury in another State" is an insufficient basis for personal jurisdiction; "[i]nstead, 'the foreseeability that is critical to due process . . . is that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there."[20]

Kendall Hunt points to Forcier's and Coniglio's contacts with Iowa that follow naturally from working for an Iowa-based company. They traveled to Iowa on occasion (most recently, Coniglio visited for two days in 2018; prior to that, neither had been to Iowa for work since 2006). They received their paychecks from banks in Iowa and accessed servers in Iowa. On average, they sent emails to and called personnel in Iowa multiple times a day. More specific to the claims, Forcier worked for years as Baiamonte's editor and primary Kendall Hunt contact (accessing the Baiamonte works from servers in Iowa). Forcier worked with Kendall Hunt personnel in Iowa (through

---

[18] *Morningside Church*, 9 F.4th at 620 (quoting *Walden v. Fiore*, 571 U.S. 277, 290 (2014)).

[19] *Id.* (alteration in original) (quoting *Walden*, 571 U.S. at 285, 290; *Whaley v. Esebag*, 946 F.3d 447, 451 (8th Cir. 2020); *Pederson*, 951 F.3d at 981).

[20] *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985).

11

email and telephone calls) on editing, developing, and marketing the Baiamonte textbooks. Forcier, along with his assistant in Iowa, drafted one of the contracts that Learning Tree is alleged to have forcibly interfered with, and he was generally involved with Baiamonte's contract negotiations (while both he and Baiamonte were outside the forum).

"[C]alls, emails, and text messages directed at a plaintiff" in the forum, standing alone, are "insufficient to establish the minimum contacts necessary under the Due Process Clause."[21] But personal jurisdiction may exist over remote employees working for forum-based employers when they emailed and called people in the forum frequently, traveled to the forum on occasion, accessed servers in the forum, and received payment and supervision from the forum. As Learning Tree notes, however, these cases (from district courts in the Eighth Circuit) involved claims for breach of employment contract or misappropriation of trade secrets.[22] "Personal jurisdiction must be determined on a

---

[21] *Morningside Church*, 9 F.4th at 620 (noting "'hundreds of telephone and email contacts' to the plaintiff" in the forum did not create personal jurisdiction when "these communications were [not] part of some broader effort by the defendants to create a connection with [the forum]" (quoting *Pederson*, 951 F.3d at 979-80)).

[22] For cases involving breach-of-employment contract, see *W. Publ'g Corp. v. Stanley*, No. Civ. 03-5832(JRT/FLN, 2004 WL 73590, at *4-6 (D. Minn. Jan. 7, 2004) (holding personal jurisdiction existed over former employee who allegedly breached noncompete when employee regularly communicated via email and telephone with people in forum, including his supervisor and people he supervised, and regularly traveled to forum); *May Dep't Stores Co. v. Wilansky*, 900 F. Supp. 1154, 1162-63 (E.D. Mo. 1995) (in action alleging former employee breached employment contract by leaving to work for competitor, holding that personal jurisdiction existed over employee because he traveled to forum multiple times for work meetings, where he acquired confidential information that would harm plaintiff if disclosed to competitor; he signed contract amendment in forum; and he had multiple telephone and virtual contacts with people in forum).

For cases involving misappropriation, see *Prairie Field Servs., LLC v. Welsh*, 497 F. Supp. 3d 381, 393-94 (D. Minn. 2020) (holding a plausible basis for personal jurisdiction existed over former employees and the new entity they formed when employees were in regular contact with forum-based employees, drew paychecks from the forum, and stole trade secrets stored on forum servers, including pricing information the new company used to submit a competing bid (allegedly constituting tortious interference)); *Custom Conveyor Corp. v. Hyde*, 237 F. Supp. 3d 895, 897, 901 (D. Minn. 2017) (holding that personal jurisdiction existed over former

12

claim-by-claim basis."[23] "For contractual claims, personal jurisdiction is proper where the defendant 'reaches out beyond one state and creates continuing relationships and obligations with citizens of another state.'"[24] For breach-of-employment-contract claims, the defendant's contacts with the forum state through prior employment bear on the parties' contractual "relationships and obligations" and thus are directly related to the claim. Similarly, the parties' general employment relationship relates to misappropriation claims in which the defendant is alleged to have accessed and stolen

---

employee who worked remotely for forum-based company as sales manager for plaintiff's clients outside the forum, when defendant was in "near constant communication with" forum-based employees via phone and email, occasionally traveled to the forum for work, was supervised from the forum, received benefits paid from the forum, and allegedly stole confidential pricing information from plaintiff's systems to compete with plaintiff, including bidding on a project against plaintiff (allegedly constituting tortious interference)).

For cases involving both claims, see *Travel Leaders Leisure Grp., LLC v. Cruise & Travel Experts, Inc.*, No. 19-cv-02871 (SRN/ECW), 2020 WL 4604534, at *3, *9-12, *14 (D. Minn. Aug. 11, 2020) (holding that specific jurisdiction existed over former employee and his newly created company because former employee worked for years from out-of-state for forum-based plaintiff, received pay from forum, occasionally traveled to forum for work, allegedly violated a noncompete contract containing a forum choice-of-law provision, allegedly stole trade secrets stored on systems in the forum, and induced other employees who serviced forum clients to breach their employment contracts with plaintiff and work for new company instead); *Sleep No. Corp. v. Young*, 507 F. Supp. 3d 1081, 1086-91 (D. Minn. 2020) (in action alleging that former employees misappropriated trade secrets and violated their employment contracts with forum-based plaintiff, holding that specific jurisdiction existed over employees and the new company they formed because through former employment, individual defendants reported to an immediate supervisor based in the forum and were in frequent contact with personnel based in the forum, traveled to the forum for work meetings, copied trade secrets from laptops issued by plaintiff, and negotiated the employment contract at issue from out-of-state with people in the forum); *Pro Edge, L.P. v. Gue*, 374 F. Supp. 2d 711, 722-24, 733 (N.D. Iowa 2005) (holding personal jurisdiction existed over employee who allegedly stole employer's nonforum clients—forming the basis for plaintiff's claims of misappropriation, tortious interference, and breach of noncompete—when employee had worked in the forum more than eight years ago but then transferred offices; employee had returned to forum for work on a couple of occasions, was in daily contact with people in the forum, was supervised from the forum, received a paycheck from the forum, and signed a noncompete agreement containing a forum choice-of-law provision), *modified on other grounds,* 411 F. Supp. 2d 1080 (N.D. Iowa 2006).

[23] *Vallone v. CJS Sols. Grp., LLC*, 9 F.4th 861, 865 (8th Cir. 2021).

[24] *Creative Calling Sols.*, 799 F.3d at 980 (cleaned up) (quoting *Burger King*, 471 U.S. at 473).

confidential information by nature of that employment. And that defendants accessed confidential information located on servers in the forum strongly relates to misappropriation claims when the defendant "allegedly reached into [the forum] (albeit virtually) to take [plaintiff's] confidential information"[25] (as in most of the cited cases).

Do Forcier and Coniglio's employment contacts "arise out of or relate to" the claims here? The Supreme Court recently confirmed that "[t]he first half of that standard asks about causation; but the back half, after the 'or,' contemplates that some relationships will support jurisdiction without a causal showing."[26] "That does not mean anything goes"—"the phrase 'relate to' incorporates real limits," and "there must be an 'affiliation between the forum and the underlying controversy, principally, an activity or an occurrence that took place' there."[27] Ultimately, "the defendant's suit-related conduct must create a substantial connection with the forum state."[28]

Here, Kendall Hunt brings claims for copyright infringement and tortious interference with its contract with Baiamonte, among others. Copying is an element of copyright infringement, which can be proven through "access to the copyrighted material."[29] Tortious interference with contract requires that the defendant "knew of the

---

[25] *Prairie Field*, 497 F. Supp. 3d at 393; *cf.* **FCStone LLC v. Buckley**, 864 F. Supp. 2d 816, 822-26 (S.D. Iowa 2012) (in action alleging misappropriation of trade secrets and breach of noncompete agreement, holding that specific jurisdiction did not exist based on defendant's former employment with forum-based plaintiff; forum choice-of-law provision in employment agreement; emails between defendant's attorney and the forum to attempt to resolve the dispute; and defendant accessing trade secrets from servers in "unidentified location" and emailing them from his work email account to his personal email account, which required the email to "pass[] through" email servers in the forum).

[26] *Ford Motor Co. v. Mont. Eighth Judicial Dist. Ct.*, 141 S. Ct. 1017, 1026 (2021).

[27] *Id.* at 1026, 1031 (cleaned up) (quoting **Bristol-Myers Squibb Co. v. Superior Ct. of Cal., S.F. Cnty.**, 137 S. Ct. 1773, 1780 (2017)).

[28] *Walden*, 571 U.S. at 284.

[29] *Warner Bros. Ent. v. X One X Prods.*, 644 F.3d 584, 595 (8th Cir. 2011).

14

existence of a contract."[30]  That Forcier worked with Baiamonte and negotiated his contracts on behalf of Kendall Hunt is therefore related to the claims at issue—Forcier (through Learning Tree) is allegedly infringing copyrights assigned to Kendall Hunt in the very contracts Forcier helped negotiate, as well as tortiously interfering with those contracts.  But the forum contacts' relatedness is more tenuous here than in other employment cases:  the meat of the claims involve Learning Tree publishing the infringing work from California to students and schools in California (and other states outside Iowa).  In addition, Forcier and Coniglio's contacts with Baiamonte on behalf of Learning Tree occurred outside the forum (they all live in California).  Indeed, even Forcier's contacts with Baiamonte for Kendall Hunt occurred outside of Iowa, although Forcier did receive assistance from other Kendall Hunt employees in Iowa during contract negotiations (and emails perhaps passed through Iowa servers).

That Learning Tree is named as Defendant, rather than Forcier and Coniglio, adds another wrinkle.  The Eighth Circuit has recognized that agency principles apply when determining an entity's contacts with the forum state.[31]  Applying these principles, other courts have recognized:

> "[W]hile it is true that in general a corporation does not exist as a legal entity until incorporated, and therefore cannot have agents before its organization[,] the pre-incorporation activities of a promoter may form the basis for corporate liability when they have been ratified by post-incorporation acts of the corporation."  The "acts of ratification relate back to the time of the original activities and establish an agency relationship permitting the acts of the promoter to constitute, in effect, acts done by the corporation."  And, based on this principle, it is "permissible to consider in the personal jurisdictional decision pre-incorporation acts that are subsequently ratified by the corporation."[32]

---

[30] *Revere Transducers, Inc. v. Deere & Co.*, 595 N.W.2d 751, 764 (Iowa 1999).

[31] *Romak USA, Inc. v. Rich*, 384 F.3d 979, 985 (8th Cir. 2004).

[32] *Travel Leaders*, 2020 WL 4604534, at *13 (cleaned up) (quoting *Rees v. Mosaic Techs., Inc.*, 742 F.2d 765, 768-69 (3d Cir. 1984)); *see also Prevention, LLC v. Eq Biosciences, Inc.*, No. 8:15-CV-256, 2016 WL 3039718, at *4-5 (D. Neb. May 27, 2016); *Ritter Disposables, Inc. v.*

15

In addition to contracts, courts have applied this rule to misappropriation claims. That is, when an employee steals trade secrets prior to forming a new company, and then the new company allegedly uses those trade secrets, courts have attributed the employee's contacts with the forum in misappropriating trade secrets to the employee's newly formed company.[33] But as Learning Tree argues, the evidence of ratification is stronger in the misappropriation context than here—Learning Tree is allegedly publishing a work that infringes the copyright of a readily available textbook written by the same author, and its actions would not necessarily require that its founders be former employees with access to confidential information.

One court has considered pre-incorporation contacts showing access in a copyright case when determining venue (not personal jurisdiction). In *Tayama v. Riom Corp.*, plaintiff brought a copyright-infringement action against an entity that owned a restaurant, the design of which allegedly infringed upon the design of plaintiff's restaurant.[34] Prior to the entity's incorporation, the entity's founder, along with a builder and an architect, visited plaintiff's restaurant (in the judicial district where the lawsuit was filed) and examined and took pictures of its design.[35] They charged their meal to a credit card in the name of the allegedly infringing restaurant (not yet built at that time).[36] The court

---

*Protner Nuev Tecnicas, S.L.*, No. 3:11CV00201SWW, 2012 WL 3860598, at *8-9 (E.D. Ark. Sept. 5, 2012).

[33] *See **Stolle Mach. Co., LLC v. RAM Precision Indus.***, 605 F. App'x 473, 477-78, 481 (6th Cir. 2015) (holding that personal jurisdiction existed over entity former employee created to compete with plaintiff using plaintiff's trade secrets, as entity ratified employee's misappropriation conduct by using the trade secrets); *Travel Leaders*, 2020 WL 4604534, at *14 (holding that when employee downloaded trade secrets from a storage location in the forum, resigned, and formed a new company a year later, the pre-incorporation misappropriation could be imputed to the newly formed corporation as it accepted the benefits); *but see **Sleep No.***, 507 F. Supp. 3d at 1089 (refusing to consider pre-incorporation contacts).

[34] *Tayama v. Riom Corp.*, No. 2:11-CV-167-J, 2012 WL 556007, at *1 (N.D. Tex. Feb. 21, 2012).

[35] *Id.*

16

held this visit sufficient for venue purposes, since access is an element of copyright infringement.[37] This case is distinguishable. Here, there is no evidence tying Forcier and Coniglio's pre-incorporation actions to Learning Tree, as in *Tayama* with the use of a company credit card. In any event, the forum contact attributed to the new entity in *Tayama*—visiting plaintiff's restaurant to copy its design—more strongly relates to the claims at issue than Learning Tree's founders' general contacts with Iowa by nature of working for an Iowa-based company. I also note that here, access is not in dispute, as the same author wrote both Kendall Hunt and Learning Tree's textbooks; rather, the case will hinge on interpreting the contract (and assignment of rights) between Kendall Hunt and the author.

Even if "ratification" is not strictly required, and Forcier and Coniglio's contacts can be attributed to Learning Tree—since in practice, Forcier and Coniglio *are* Learning Tree (even if there is a legal distinction between them), their forum contacts weakly relate to the claims at issue. As part of their employment with Kendall Hunt, Forcier and Coniglio visited Iowa and were in near constant communication with people in Iowa (via email and telephone). But the claims here only tangentially involve the employment relationship between Kendall Hunt and Forcier and Coniglio (unlike cases involving misappropriation or breach of a noncompete agreement). Forcier and Coniglio's general contacts with Iowa through their prior employment—including the daily emails and phone calls and infrequent visits—do not sufficiently relate to the claims at issue to form the basis for personal jurisdiction.[38]

---

[36] ***Id.***

[37] ***Id.*** at *4.

[38] *Cf.* **Pangaea, Inc. v. Flying Burrito LLC**, 647 F.3d 741, 747 (8th Cir. 2011) (holding defendant's visit to the forum to obtain permission to use plaintiff's trademark did not sufficiently relate to plaintiff's trademark-infringement claim, premised on defendant opening a restaurant with the same name as plaintiff's outside the forum); **Miller v. Nippon Carbon Co.**, 528 F.3d 1087, 1092 (8th Cir. 2008) (when plaintiff's decedent was killed unloading a product sold by the defendant and en route to a forum customer, holding that personal jurisdiction did not exist over

The facts of this case are most similar to the Eighth Circuit's decision in *Johnson v. Arden*.[39] In that case, plaintiffs and defendant both bred cats and maintained websites for their businesses—plaintiffs in Missouri, and defendant in Colorado.[40] Six years before plaintiff's lawsuit, defendant purchased a cat from plaintiffs.[41] For the next four years, defendant provided administrative assistance to plaintiffs (such as proofreading), and she purchased cats on plaintiffs' behalf, but she was never paid a salary or formally employed.[42] All told, defendant purchased sixteen cats for plaintiffs.[43] Plaintiffs retrieved some of the cats from the sellers themselves, but defendant shipped seven of the cats and personally delivered two of the cats to plaintiffs in Missouri.[44] Two years after the parties' "limited business relationship" ended, plaintiffs sued defendant in Missouri for defamation and trademark infringement.[45] They alleged defendant posted a false review of their business on an online messaging board, calling plaintiffs' Missouri operation a "kitten mill" and accusing plaintiffs of selling cats with health problems and of killing unwanted cats.[46] Plaintiffs also alleged defendant's website for her cat breeding business infringed upon their trademark.[47] The court held specific jurisdiction did not

---

the defendant, because its forum contacts—selling product to a company in the forum and visiting that company once or twice a year—did not "arise out of or relate to" the wrongful death claim, which alleged negligence in the packing, shipping, and unloading of the product, none of which occurred in the forum nor involved the defendant).

[39] 614 F.3d 785.

[40] *Id.* at 787-88.

[41] *Id.* at 795.

[42] *Id.* at 788, 795.

[43] *Id.* at 788.

[44] *Id.*

[45] *Id.* at 788, 795

[46] *Id.* at 796.

[47] *Id.* at 797.

18

exist over defendant in Missouri courts.[48] The court did not discuss the parties' prior business relationship in the specific-jurisdiction analysis, even though arguably, there was a weak relation between defendant's prior employment with plaintiffs and the claims at issue—defendant's allegedly defamatory statement could have been based on things she saw while working for plaintiffs, and defendant had obvious knowledge of plaintiffs' trademark through her prior employment.

Overall, here, Forcier's and Coniglio's general contacts with Iowa through their prior employment for an Iowa-based company cannot be attributed to Learning Tree and do not relate to the claims at issue. The remaining contacts can be summarized as follows: (1) one of Learning Tree's founders accessed the infringed-upon work from servers located in the forum through his prior employment; (2) one of Learning Tree's founders negotiated Kendall Hunt's contracts with Baiamonte from outside the forum, using assistance from employees in the forum; (3) Learning Tree knew the effects of its tortious conduct would be felt in the forum;[49] and (4) Kendall Hunt purchased the infringing product from Learning Tree's website, accessible in the forum. Learning Tree and its founders worked with Baiamonte in California, Learning Tree marketed its textbooks to schools and students in California, and Learning Tree has no sales to Iowa (other than the manufactured purchase by Kendall Hunt). The nature, quality, and quantity of the contacts weigh against a finding of specific jurisdiction—they do not demonstrate that Learning Tree purposefully directed its activities at Iowa or sought to avail itself of the benefits and protections of Iowa's laws. As for the remaining factors, Iowa "has an interest in providing a forum for a company with its headquarters here" (the fourth

---

[48] *Id.* at 798.

[49] Post-*Walden*, the Eighth Circuit has considered this as one factor among many supporting personal jurisdiction. *See* **Whaley**, 946 F.3d at 452-53.

19

Case 2:21-cv-01004-KEM Document 49 Filed 03/29/22 Page 19 of 20

factor),[50] and the convenience factor is neutral, as "[a] trial in [California] would be just as inconvenient for [Kendall Hunt] as a trial in [Iowa] would be for [Learning Tree]."[51]

Kendall Hunt has not proved the existence of specific jurisdiction over Learning Tree. I therefore grant the motion to dismiss.

### III. CONCLUSION

The motion to dismiss for lack of personal jurisdiction is **granted** (Doc. 20). The court dismisses this case without prejudice. The Clerk of Court is directed to enter judgment in favor of Defendant.

**SO ORDERED** March 29, 2022.

_____
Kelly K.E. Mahoney
Chief United States Magistrate Judge
Northern District of Iowa

---

[50] *Dairy Farmers of Am., Inc. v. Bassett & Walker Int'l, Inc.*, 702 F.3d 472, 479 (8th Cir. 2012).

[51] *K-V Pharm.*, 648 F.3d at 595.